**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

| | |
|---|---|
| ROBERT HECHTER SILVERMAN,<br><br>Plaintiff,<br><br>v.<br><br>JULIE HECHTER SILVERMAN,<br><br>Defendant. | Civil No. 00-2274 (JRT)<br><br>**FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER DENYING PLAINTIFF'S PETITION** |

---

Susan Anderson McKay, MCKAY LAW OFFICE, 11359 Windrow Drive, Eden Prairie, Minnesota, 55344, for plaintiff.

Michael Baxter, LAW OFFICES OF MICHAEL BAXTER, 14501 Granada Drive, Suite 200, Apple Valley, Minnesota, 55124, for defendant.

Plaintiff Robert Hechter Silverman brings this action against defendant Julie Hechter Silverman (now Julie Hechter) pursuant to the Hague Convention, 19 I.L.M. 1501 (1980), and the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 11601 *et seq.*, alleging that she wrongfully removed their children to or retained them in the United States. Plaintiff contends that the children are habitual residents of Israel within the meaning of Article 3 of the Convention and accordingly seeks an order from the Court directing the prompt return of the children to that country. Plaintiff also seeks an order directing defendant to pay his attorney's fees pursuant to 42 U.S.C. § 11607(b)(3). The Court has jurisdiction to hear this matter under ICARA Section 4. 42

FILED MAY 2002
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD. MAY 9 2002
DEPUTY CLERK

U.S.C. § 11603(a) (providing concurrent original jurisdiction over actions arising under the Convention in state and federal district courts).

This matter came on for an evidentiary hearing before the Court on March 18, 2002. The Court heard testimony from plaintiff's father, plaintiff and defendant, received affidavit testimony and obtained exhibits. Afterwards, the Court interviewed Samuel Silverman, age ten, in chambers with counsel present. The Court then gave the parties an opportunity to submit closing arguments and amended findings of fact and conclusions of law to the Court. Based on the entire record and proceedings, the testimony at the hearing and arguments of counsel, the Court enters the following findings of facts and conclusions of law.

## FINDINGS OF FACT

1. All of the Findings of Fact set forth herein are undisputed or have been proved by a preponderance of the evidence.

2. To the extent that the Court's Conclusions of Law include what may be considered Findings of Fact, they are incorporated herein by reference.

3. Robert was born in South Africa and holds dual citizenship in the United States and Israel.

4. Julie is a dual citizen of the United States and Israel. She holds a degree in sociology from the University of Washington.

5. Robert and Julie met in 1988 while both were working at the Hyatt Hotel in Jerusalem—he as a cook and she as the Assistant Restaurant Manager.

6. In March 1989, Robert and Julie moved to the United States for Robert to pursue his studies. They were married in Seattle, Washington on July 16, 1989. At the time, they resided in Poughkeepsie, New York.

7. Robert and Julie moved to San Francisco, California in 1991 where their oldest son, Samuel, was born on March 2, 1992. Sam is now ten years old.

8. The family lived in San Francisco until April 1993 when they moved to Los Angeles, California. In May 1995, the family moved from Los Angeles to Plymouth, Minnesota where they resided from May 1995 until the end of July 1999.

9. Their second son, Jacob, was born on July 5, 1995 in Minneapolis, Minnesota. He is now 6 years old.

10. In the summer of 1997, Robert and Julie contacted a realtor in Israel to inquire about purchasing property with the intention of relocating to Israel but could not make any commitment until they sold their home in Minnesota.

11. In April 1998, the family began their efforts to sell their home. During this time, Julie obtained estimates of the cost to have their property moved to Israel.

12. Their home was sold in January 1999 and the closing took place on March 26, 1999. In March 1999, Robert began applying for Aliyah to Israel, which is the equivalent of immigration. Julie had already made Aliyah in 1987 during her residence in Israel from 1987 to 1989.

13. Julie does not dispute that she wanted to move to Israel and believed that Israel would be the right place to raise children. She also says that she and Robert set the move up to be permanent, but as time drew nearer to the move, she was very torn because

she did not think she wanted to stay in the marriage. Robert and Julie had problems in their marriage for a very long time and had sought marital counseling several times.[1]

14. In the months leading up to the move, Robert was working in La Crosse, Wisconsin. According to Julie, she and Robert were separated at the time, although Robert denies this.

15. By July, Julie says she did not want to go to Israel but Robert convinced her to make the move. Julie agreed, stating that she made the move only as a final effort to reconcile her marriage.

16. The family left the United States on July 26, 1999 and arrived in Tel Aviv on July 27, 1999.[2] The household goods had arrived in Israel three months prior to the family's arrival in Israel.

17. Upon their arrival, the family stayed with relatives. They first stayed with Robert's sister in Hod Hosharon, Israel for one month. In late August 1999, the family moved to Raanana, Israel and stayed with Robert's parents for another two months. Raanana is located about 20 kilometers from Tel Aviv. Almost immediately, as early as August 1999, Julie says that she told Robert she wanted to return to the United States.

18. Robert and Julie never purchased a home in Israel, but in October, they entered into a lease to rent an apartment and moved into the apartment in November.

---

[1] Julie admits she had a relationship with another man. Although it is not clear when the relationship began, Robert learned of the affair in April 1999 after searching temporary internet files and reading Julie's email messages.

[2] As part of the benefits Robert received for making Aliyah, the family received vouchers to travel to Israel from the Aliyah Center. The voucher meant that their travel would only cost them $100.00 for the entire family.

19. In October 1999, Julie flew back to the United States to file for bankruptcy in Minnesota after learning from her father that she and Robert were nearly $100,000 in debt. According to Julie's testimony, she wanted to take the children with her to the United States, but Robert refused to let the children go with her.

20. Upon her return, Julie learned that Robert had obtained a Tzav Ikuv (the equivalent of a restraining order) which prevented her from leaving Israel.[3] On that same day, Robert informed Julie that he knew about her affair and that he had been reading her emails for the last six months. Robert canceled the restraining order on November 3, 1999 after the parties agreed to try again to reconcile their marriage. Nonetheless, Robert testified at his deposition and acknowledged at the hearing that he would not have allowed Julie to leave Israel with the children at any point between October 1999 and June 2000. Julie also testified that for the last nine months of her stay in Israel, Robert engaged in threats, force and coercion during this time which prevented her from leaving Israel.

21. As for the children, Sam was enrolled in the Havovel Elementary School and Jacob was enrolled in preschool. They made friends, learned to speak Hebrew and did well in school. Sam participated in extracurricular activities, including chess club, basketball and baseball.

---

[3] Julie also learned that Robert had put the children's passports and birth certificates in his father's safe deposit box in the bank.

22. In January 2000, Julie and Robert returned to Minnesota to complete the bankruptcy proceeding.[4] Both parties attended the bankruptcy discharge hearing and stated, under oath, that their permanent address was Plymouth Minnesota.[5]

23. In April 2000, the parties filed a joint United States income tax form for 1999 which listed their address as Plymouth, Minnesota. Both parties signed the tax return.

24. In June 2000, Julie left Israel with the two children for a summer trip to the United States and Canada, obtaining Robert's written consent to make the trip. She purchased roundtrip tickets and was scheduled to return to Israel on August 30, 2000. At the airport before their departure, Robert threatened Julie. It was at that moment, Julie says, that she made the decision not to return to Israel.

25. Julie filed for legal separation from Robert and custody of the two children in Hennepin County District Court on August 10, 2000. Robert was served with the petition in Israel. Robert then filed a motion to dismiss the action, contending that the court lacked jurisdiction to hear the custody issues. Robert also filed a Hague Petition on October 10, 2000 in federal district court seeking return of the children to Israel. On that same day, the state court heard argument on Robert's motion to dismiss for lack of jurisdiction.

---

[4] The children remained in Israel and stayed with their paternal grandparents, who live across the street from the elementary school.

[5] Both parties also admit they did not disclose a transfer of $9,000.00 to Julie's father from the sale of their home.

26. On October 17, 2000, the state court referee issued an order 1) granting Julie temporary sole legal custody and temporary sole physical custody of the children, 2) granting Robert the right to reasonable visitation, and 3) appointing a guardian ad litem for the children.

27. On May 4, 2001, the state court issued its Findings of Fact, Conclusions of Law, Order for Judgment and Judgment and Decree. In its Findings of Fact, the court found that the parties' move to Israel in August 1999 was temporary and was made in an attempt to restore stability in their marriage. The court further found that Julie and the children would have returned to Minnesota from Israel in October of 1999 but they were prevented from doing so by Robert. The court also relied on the fact that in a bankruptcy petition filed in October 1999, both Robert and Julie signed the joint petition listing their permanent address as 1300 West Medicine Lake Road, Plymouth, Minnesota.

28. While the state proceeding was still pending, Julie moved in the federal court to dismiss the case on abstention grounds. On November 13, 2000, then-Chief Judge Paul A. Magnuson granted her motion, concluding that there is an ongoing state proceeding which implicates important state interests and that Robert has an adequate opportunity to raise the Hague issues in state court. *Silverman v. Silverman*, Civ. No. 00-2274 at 5-7 (PAM/JGL) (Nov. 13, 2000).

29. Robert appealed that decision and on October 4, 2001, the Eighth Circuit concluded that abstention was improper and remanded the case for an evidentiary hearing. *Silverman v. Silverman,* 267 F.3d 788, 792 (8th Cir. 2001), *petition for reh'g en banc* denied. The case was reassigned to this Court and defendant moved shortly

thereafter for a jury trial based on the Eighth Circuit opinion. On February 21, 2002, the Court denied defendant's motion. *Silverman v. Silverman,* No. 00-2274, 2002 WL 264932 at * 4 (D. Minn. Feb. 21, 2002).

30. While the state and federal cases were pending in the United States, a rabbinical court in Israel ruled on November 16, 2000 that Israel was the place of residence of Sam and Jacob during the eleven-month period in question and that Julie's failure to return to Israel in August 2000 was prima facie evidence of wrongful retention of the children in violation of the Convention. The decision was upheld on October 30, 2001.

## CONCLUSIONS OF LAW

The Hague Convention, to which the United States and Israel are signatories, is an international treaty adopted "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence." Hague Convention, Preamble. Its primary purpose is "to restore the *status quo ante* and to deter parents from crossing international boundaries in search of a more sympathetic court." *Rydder v. Rydder*, 49 F.3d 369, 372 (8th Cir. 1995) (citing *Friedrich v. Friedrich*, 983 F.2d 1396, 1400 (6th Cir. 1993)). A decision under the Convention is not an adjudication of the merits of any underlying custody claim. Hague Convention, art. 19; 42 U.S.C. § 11601(b)(4).

In order to obtain relief under the Convention, plaintiff must prove by a preponderance of the evidence that his children were "wrongfully removed or retained

within the meaning of the Convention." 42 U.S.C. § 11603(e)(1)(A).[6] To demonstrate wrongfulness under Article 3 of the Convention, plaintiff must prove that: "1) defendant [retains] the children from their "habitual residence," and 2) plaintiff was exercising his parental custody rights over the child at the time of the [retention]." *Freier v. Freier,* 969 F. Supp. 436, 439 (E.D. Mich. 1996); *Miller v. Miller,* 240 F.3d 392, 398 (4th Cir. 2001).

If plaintiff satisfies his burden that the retention of Sam and Jacob was wrongful, the Court must order the return of the children to their habitual residence unless defendant establishes one of the affirmative defenses set forth in Articles 12, 13 or 20 of the Convention. These exceptions are construed narrowly. *Rydder v. Rydder*, 49 F.3d 369, 372 (8th Cir. 1995).

In this case, defendant asserts there is a grave risk that returning Sam and Jacob to Israel "would expose them to physical or psychological harm or otherwise place them in an intolerable situation." Hague Convention, art. 13(b). Defendant also contends that Samuel, age 10, objects to being returned to Israel and that he "has attained an age and degree of maturity at which it is appropriate to take account of his views." Hague Convention, art. 13.[7]

---

[6] Because Robert expressly permitted Julie to leave Israel in June 2000, but did not consent to her keeping the children in the United States permanently, the Court treats this case as one of an alleged "wrongful retention." *Feder v. Evans-Feder,* 63 F.3d 217, 220 n.4 (3d Cir. 1995).

[7] Defendant has also suggested that repatriation to Israel is inappropriate because Sam and Jacob are settled in their new environment. Plaintiff correctly notes that the well-settled exception contained in Article 12 of the Convention is triggered only when a Hague proceeding is commenced after the expiration of one year. In this case, plaintiff filed his Hague petition well within the one year time period and therefore the Article 12 defense does not apply. Nonetheless, as discussed *infra,* the argument that the children are settled in their new

(Footnote continued on next page.)

## I. Habitual Residence

As stated above, plaintiff carries the burden of proving by a preponderance of the evidence that Julie's refusal to return Sam and Jacob to Israel constitutes a wrongful retention under the Convention. To satisfy this burden, plaintiff first must establish that the habitual residence of Sam and Jacob at the time of the wrongful retention was Israel. *Miller v. Miller,* 240 F.3d 392, 398 (4th Cir. 2001); *Cohen v. Cohen,* 602 N.Y.S.2d 994, 998-99 (Sup. Ct. 1993).[8]

The Hague Convention does not specifically define the term "habitual residence." As one court observed, "[t]his has been a matter of deliberate policy, the aim being to leave the notion free from technical rules, which can produce rigidity and inconsistencies as between legal systems." *In re Bates*, No. CA122.89 at 9-10, High Court of Justice, Fam. Div'n Ct. Royal Court of Justice, United Kingdom (1989). Consequently, the determination of one's habitual residence is a fact-based inquiry to be analyzed on a case-by-case basis.

While the intent of the framers of the Convention is for the concept of habitual residence "to remain fluid and fact based," *Levesque v. Levesque*, 816 F. Supp. 662, 665 (D. Kan. 1993), several district and circuit courts have given more precise descriptions of "habitual residence." The Eighth Circuit has characterized habitual residence as

(Footnote continued.)
environment, while not dispositive under Article 12, can be a relevant factor in the grave risk analysis.

[8] There is no dispute that Robert was exercising his parental rights at the time of the alleged retention in the summer of 2000. Robert has continued to exercise his custody rights by maintaining contact with his children by telephone.

one's "ordinary residence." *Rydder,* 49 F.3d at 373. Many courts have cited with approval the view articulated by Lord Scarman in *Shah v. Barnet London Borough Council and other appeals*:

> [T]here must be a degree of settled purpose. The purpose may be one or there may be several. It may be specific or general. All that the law requires is that there is a settled purpose. That is not to say that the propositus intends to stay where he is indefinitely. Indeed his purpose while settled may be for a limited period. Education, business or profession, employment, health, family or merely love of the place spring to mind as common reasons for a choice of regular abode, and there may well be many others. All that is necessary is that the purpose of living where one does has a sufficient degree of continuity to be properly described as settled.

*Shah,* [1983] 1 Al E.R. 226, 233 (Eng. H.L.) (discussed and adopted in *In re Bates*, at ¶ 33).

In one of the most recent decisions on this issue, the Ninth Circuit concluded that "the first step toward acquiring a new habitual residence is forming a settled intention to leave the one left behind." *Mozes v. Mozes,* 239 F.3d 1067, 1075 (9th Cir. 2001). The court further held that, although it is the child's habitual residence that is being determined, "'the intention or purpose which has to be taken into account is that of the person or persons entitled to fix the place of the child's residence.'" *Id.* at 1076 (quoting E.M. Clive, *The Concept of Habitual Residence*, 1997 Jurid. Rev. 137, 144). The Third Circuit has similarly noted that the determination requires consideration of both the child's circumstances and the parents' shared intent. *Feder v. Evans-Feder,* 63 F.3d 217, 224 (3d Cir. 1995) (explaining that "a determination of whether any particular place satisfies this standard must focus on the child and consists of an analysis of the child's circumstances in that place and the parents' present, shared intentions regarding their

child's presence there"). In *Ponath v. Ponath,* 829 F. Supp. 363 (D. Utah 1993), the district court echoed this view, observing that "[a]lthough it is the habitual residence of the child that must be determined, the desires and actions of the parents cannot be ignored." *Id.* at 367. The court continued, "[t]he concept of habitual residence must . . . entail some element of voluntariness and purposeful design." *Id.*[9]

Evaluating the case at bar under the above standards, the Court determines that the habitual residence of Sam and Jacob never changed from the United States to Israel and therefore, Julie's retention of the children in the United States since June 2000 was not wrongful. With the exception of the eleven months spent in Israel, Sam and Jacob have spent their entire lives in the United States. The evidence also indicates that their time in Israel would have been much shorter had Julie not been prevented from leaving Israel with the children from October 1999 until June of 2000. From October to November, she was prevented from leaving Israel by virtue of the Tzav Ikuv issued by an Israeli court on an ex parte basis. Although that order was lifted a month later, Robert stated at his deposition and at trial that he would not have allowed his wife to leave Israel with the children in September, October, November or December 1999. He also agreed that he would not have allowed Sam and Jacob to leave Israel in January, February, March,

---

[9] The Court notes that the Eighth Circuit has discussed caselaw from the Sixth Circuit which concludes that parental intent is not relevant to the habitual residence determination. *Nunez-Escudero,* 58 F.3d at 379 (citing *Fredrich v. Fredrich*, 983 F.2d 1396, 1401-02 (6th Cir. 1993) (stating that "to determine the habitual residence, the court must focus on the child, not the parents, and examine past experience, not future intentions"). In the Court's view, it is difficult, if not impossible, to consider the question of habitual residence without some consideration of the parents' intent. Accordingly, the Court agrees with the Ninth Circuit that parental intent is a relevant factor to be considered along with other factors in the determination of habitual residence. The Court also notes that the Eighth Circuit did not have the benefit of the *Mozes* decision at the time it decided *Nunez.*

April, May and June of 2000 and that he would have prevented Julie from leaving had he believed that she would return with the children to the United States permanently. Julie also testified that in the last year they were together in Israel, Robert was physically violent towards her and that he threatened to take her children away from him.[10] Although Robert denies the abuse, the issue is one of witness credibility and, on this point, the Court finds Julie more credible. *Tsarbopoulos v. Tsarbopoulos,* 176 F. Supp. 2d. 1045, 1056 (E.D. Wash. 2001) (weighing the credibility of the witnesses in determining whether verbal and physical abuse did occur).

In two similar cases, courts have concluded that a coerced residence is not a settled intent to live there. *Ponath,* 829 F. Supp. at 368; *Tsarbopoulos*, 176 F. Supp. 2d. 1045. In *Ponath*, petitioner, a citizen of Germany, and respondent, a citizen of the United States, lived in Utah with their two-year-old son. *Id.* at 366. On November 6, 1991, the family traveled to Germany on roundtrip tickets to visit petitioner's family. *Id.* Although they were scheduled to return to the United States a month later, they remained in Germany much longer. *Id.* Two weeks after arriving there, petitioner found employment and by April 1992, he began construction of a house on property near that of his parents. *Id.* As early as February 1992, respondent expressed her desire to return to the United States with the minor child, but petitioner refused to permit her to leave and prevented them from leaving through verbal, emotional and physical abuse. *Id.* The court

---

[10] Robert admits that on one occasion he and Julie got into a violent argument in the car and at one point he leaned over and opened the passenger side door where Julie was seated. Robert was driving about 40-55 miles an hour at the time. Julie also testified that Robert slammed Julie up against stone walls in their apartment. Julie also claims Robert verbally threatened her by telling her that he would see her dead before he would see her divorced.

concluded that the habitual residence of the minor child was the United States. *Id.* at 367. In reaching this conclusion, the court explained:

> [W]hat began as a voluntary visit to petitioner's family in Germany, albeit an extended visit, might be viewed by the court as a change of habitual residence of the minor child but for respondent's intent and desire to return to the United States with the minor child and petitioner's willful obstruction of that purpose. Petitioner's coercion of respondent by means of verbal, emotional and physical abuse removed any element of choice and settled purpose which earlier may have been present in the family's decision to visit Germany. . . . For the court to grant petitioner's motion, and thereby sanction his behavior in forcing continued residence in Germany upon respondent, and through her, the minor child, would be to thwart a principle purpose of the Hague Convention. In the court's view, coerced residence is not habitual residence within the meaning of the Hague Convention.

*Id.* at 367-68.

In *Tsarbopoulos,* the children were all born in the United States and lived in the United States their entire lives until their father, a Greek citizen and naturalized citizen of the United States, accepted a position with the Goulandris Museum in Athens, Greece. 176 F. Supp. 2d at 1051. At the time, Dr. Tsarbopoulos worked at the Schering-Plough Research Institute in New Jersey. Although the family moved to Greece in October 1997 and Dr. Tsarbopoulos signed a two-year contract[11] with the museum, Dr. Tsarbopoulos did not resign from his position with Schering-Plough until January 1998. *Id.* at 1052-53. During that time, he maintained his insurance benefits and represented to the company that he still lived in New Jersey. *Id.* He also maintained various financial arrangements in the United States, including a U.S bank account and U.S. addresses in order to qualify

---

[11] The contract was renewed in January 1999 for another two-year period, but then was modified in September 1999, extending the contract for a term of indefinite duration. *Id.* at 1052.

for air mileage. *Id.* at 1052. The facts also revealed a history of verbal and physical abuse by Dr. Tsarbopoulos towards his wife, Kristi Tsarbopoulos. *Id.* at 1050. Witnesses described Dr. Tsarbopoulos as a very domineering husband who controlled the finances and decision-making process and kept his wife socially isolated. *Id.* This conduct continued in Greece and worsened to the point where, in December 1999, Kristi Tsarbopoulos returned to the United States with the three children. *Id.* at 1054.

Petitioner filed a Hague petition, arguing that Greece was the habitual residence of his children because, among other things: 1) the family had lived there for 27 months; 2) the family took all of their clothes and belongings to Greece; 3) he sought and obtained repatriation benefits to aid with the move[12] and 4) his wife had once stated that she had a "dream of living in Greece." The court rejected the father's argument, concluding that Greece was not the habitual residence of the children and that the United States continued to be their habitual residence. *Id.* at 1057. In the court's view, the children did not sufficiently acclimatize to Greece to make it their habitual residence. *Id.* at 1055. The two youngest children had very little socialization outside the family. *Id.* Although Hari, the oldest, attended school and began to learn the Greek language, the court found this evidence insufficient to establish Greece as his habitual residence. *Id.* The court further determined that the Tsarbopolous's did not have a shared intent to abandon the United States as their habitual residence. *Id.* The court based this decision, in part, on the verbal and physical abuse endured by Ms. Tsarbopoulos. *Id.* at 1056. According to the court,

---

[12] These benefits are available only to Greek citizens and enabled Dr. Tsarbopoulos to bring goods to Greece without paying taxes. *Id.* at 1055.

"[t]he verbal and physical abuse of one spouse by the other is one of several factors in the Court's determination of the existence of 'shared intent' to make a place the family's 'habitual residence.'" *Id.*[13]

The Court is guided by these decisions and, for the reasons stated above, finds that Julie's residence in Israel from October to June was coerced and that she did not share a settled intent to make Israel the family's habitual residence. There is also evidence, as there was in *Tsarbopoulos*, which calls into question the permanency of the move to Israel. In the bankruptcy petition filed in October 1999 and when they appeared in court in January 2000, the parties swore under oath that their residence was 1300 Medicine Lake Road, Plymouth Minnesota. Likewise, the couple's 1999 income tax forms, filed in April 2000 and signed by both parties, lists Plymouth, Minnesota as their residence.

Even though Robert applied for and made Aliyah upon the family's move to Israel, that status does not suggest a conclusion that the family's move was intended to be permanent. The Aliyah process provides substantial financial benefits and given the financial difficulties faced by the parties at the time, it would not be unusual for them to seek help, regardless of whether the parties intended to remain in Israel.

There is evidence that Julie sought employment while in Israel and enrolled the kids in school. Robert also emphasizes statements Julie made in emails to others which, he argues, contradict Julie's claim that she did not want to remain in Israel. In particular, plaintiff relies on the fact that, shortly after arriving in Israel, she told a friend, "I've

[13] The court also relied on: 1) Dr. Tsarbopoulos's control and domination over decisions and finances of the family; 2) his continued ties with the United States; and 3) his misrepresentations to Schering-Plough concerning his residence and his status of employment. *Id.* at 1056-57.

waited 20 years to make this move." When read in context, however, the Court finds that Julie made the statement in an effort to make the best of the situation before her. The statement, on its own, is thus entitled to little weight. As for the other evidence relied on by Robert, the Court acknowledges that the record is not completely devoid of evidence supporting his position. The same was true in *Tsarbopoulos*. However, it is plaintiff who carries the burden on this issue, and, for the reasons stated above, the Court finds that this burden has not been satisfied. *Cohen*, 602 N.Y.S.2d at 999 (petition must fail because petitioner did not satisfy one of the requirements for relief under the Convention). Accordingly, for all the foregoing reasons, the Court finds that the habitual residence of Sam and Jacob is the United States and therefore, Julie's retention of the children in the United States is not wrongful.

## II. Affirmative Defenses

### A. Grave Risk of Harm

Even if the Court had determined that Israel was the habitual residence of Sam and Jacob, the Court finds, in the alternative, that their return to Israel would pose a grave risk of physical harm or otherwise place them in an intolerable situation. Article 13(b) of the Convention provides that:

> Notwithstanding the provisions of the preceding Article, the judicial or administrative authority of the requested State is not bound to order the return of the child if the person, institution or other body which opposes its return establishes that . . . .
>
> (b) there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.

Hague Convention, art. 13, 19 I.L.M. at 1502. As with the concept of habitual residence, many courts have interpreted the scope of this exception. In *Thomson v. Thomson,* the Supreme Court of Canada held that "the physical or psychological harm contemplated by the first clause of art. 13(b) is harm to a degree that also amounts to an intolerable situation." 119 D.L.R.4th 253, 286 (Can. 1994). A British court has concluded that the harm required to trigger the grave risk defense is "something greater than would normally be expected on taking a child away from one parent and passing him to another." *In re A.*, 1 F.L.R. 365, 372 (Eng. C.A. 1988). The Eighth Circuit has cited to these decisions with approval. *Nunez-Escudero v. Tice-Menley,* 58 F.3d 374, 377 (8th Cir. 1995) ("We should give considerable weight to these well-reasoned opinions of other Convention signatories."). The court in *Nunez* further emphasized that "[t]he Article 13b inquiry does not include an adjudication of the underlying custody dispute." *Id.* According to the Eighth Circuit, "[i]t is not relevant to this Convention exception who is the better parent in the long run, or whether [respondent] had good reason to leave her home in Mexico and terminate her marriage to [petitioner], or whether [respondent] will suffer if the child she abducted is returned to Mexico." *Id.* What is relevant are the circumstances and environment in which the child will reside upon his or her return. In other words, "the Article 13b inquiry must encompass some evaluation of the people and circumstances awaiting that child in the country of his habitual residence."[14] *Id.* at 378.

---

[14] The Sixth Circuit has interpreted these standards to mean that a grave risk of harm under the Convention can exist in only two situations:

> First, there is a grave risk of harm when return of the child puts the child in imminent danger prior to the resolution of the custody dispute—e.g. returning

(Footnote continued on next page.)

Under the implementing legislation for the Convention, a party opposing return based on an Article 13(b) exception must establish the exception by clear and convincing evidence. 42 U.S.C. § 11603(e)(2)(A).

Upon review of the evidence presented in the case, the Court finds that returning Sam and Jacob to Israel for determination of the custody issue would expose them to a grave risk of physical harm and place them in an intolerable situation. Israel is currently in a state of turmoil. Although, as plaintiff testified, Israel has always been a country at conflict to some extent, it is clear that the intifada has escalated dramatically in recent months. At the hearing, defendant presented evidence of the violence occurring in the region. It is undisputed that on March 16, 2002, a Palestinian gunman opened fire and killed two people, including a 17-year-old student, in the City of Kfar Saba. Each and every witness called to testify acknowledged that Kfar Saba is less than five miles from plaintiff's home in Raanana. Witnesses also acknowledged that another Palestinian bombing occurred in Netanya, a city only 15 miles from Raanana.

Since the hearing on March 18, the violence in the region has steadily worsened. On March 22, 2002, a Palestinian suicide bomber killed three Israelis and wounded 40 more in Jerusalem. *See* "Jerusalem Bomber Kills 3 and Shakes U.S. Peace Effort," N.Y. Times at A1, Mar. 22, 2002. On March 28, 2002, another Palestinian suicide bomber

---

(Footnote continued.)

> the child to a zone of war, famine or disease. Second, there is a grave risk of harm in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection.

*Friedrich v. Friedrich*, 78 F.3d 1060, 1069 (6th Cir. 1996).

blew himself up in a crowded hotel dining room in Netanya as more than 200 people gathered for the Passover holiday meal. *See* "Bomb Kills At Least 19 in Israel as Arabs Open Beirut Meeting," N.Y. Times at A1, Mar. 28, 2002. The incident, "kill[ed] at least 19 and wounded more than a 100 others, many of them children." *Id.* On April 1, 2002, another suicide bomber detonated himself in a popular café in Haifa, a town in Northern Israel. *See* "Sharon Says Israel is in a War After Suicide Bombing Kills 14; More Tanks Move in West Bank," N.Y. Times at A1, Apr. 1, 2002. The blast killed 14, wounded 40 others and was described as "among the deadliest of the 18-month conflict." *Id.* On April 10, 2002, a bomb exploded on a commuter bus near Haifa, killing at least five people and injuring 20 others. *See* "Ambush Kills 13 Soldiers: *More dead today as bus blast kills at least 5 near Haifa,*" Minneapolis Star Tribune at A1, Apr. 10, 2002. On April 12, 2002, a female suicide bomber blew herself up at a bus stop in Jerusalem's crowded outdoor market, killing six people and wounding many others. *See* "Bomb Rips at Peace Effort," Minneapolis Star Tribune at A1, Apr. 13, 2002. The escalating violence prompted the State Department to issue travel warnings, telling Americans not to travel to Israel, the West Bank or Gaza and advising American residents in Jerusalem to leave the city. *See* "State Department issues new travel warning for Americans in Israel," 2002 WL 3319550, NBC News: Today, Apr. 3, 2002. Most recently, on May 7, 2002, 15 people were killed in a suicide bombing of a gambling club in Rishon le Zion, Israel, located 10 miles south of Tel Aviv. *See* "15 Killed by Suicide Bomber; Sharon

Cuts Short U.S. Visit After a Meeting with Bush," N.Y. Times at A1, A14, May 8, 2002. The Court takes judicial notice of these events in consideration of this issue.[15]

There is evidence in the record, particularly from plaintiff's father, Maurice Silverman, who lives in Raanana and works in Tel Aviv, that, despite the events, schools and business have not closed. Plaintiff contends that the facts of this case are indistinguishable from those in *Freir v. Freier,* 969 F. Supp. 436 (E.D. Mich. 1996), in which the court held that unrest in Israel was insufficient to establish the grave risk defense. *Id.* at 443. The Court does not agree. Significant differences exist between the violence occurring at the time *Freir* was decided and the violence occurring in Israel today. Unlike before, the violence has permeated areas that were previously unaffected by the conflict. Furthermore, the type of violence, through suicide bombings, has placed civilians, including children, at much greater risk. The level and intensity of violence occurring in Israel today thus goes well beyond "some unrest" described in *Freier*. In the Court's view, the current situation in Israel meets the "zone of war" standard contemplated by the Sixth Circuit in *Friedrich.*

The Court also takes account of the fact that Sam and Jacob are settled in their new environment and that Sam objects to returning to Israel. The Second Circuit has held that a court may consider the degree to which a child has settled in his or her new environment as well as that child's views in deciding whether the grave risk defense has

---

[15] According to Federal Rule of Evidence 201, "[a] court may take judicial notice, whether requested or not," and such notice "may be taken at any stage of the proceeding." Fed. R. Evid. 201(c) & (f). The facts noted above are appropriate for judicial notice as they are facts not subject to reasonable dispute and are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b).

been established under Article 13(b). *Blondin v. Dubois,* 238 F.3d 153, 163-68 (2d Cir. 2001). Sam and Jacob have lived in the United States for nearly two years, a time period longer than that spent in Israel. In this time, Sam and Jacob have adjusted extremely well to their environment, as evidenced by letters submitted by teachers of the Touchstone Community School in Worcester, Massachusetts, where they now live, and Rabbi Bernstein of the Temple Sinai.

Additionally, Sam objects to returning to Israel, in part because of the violence in the region. *Blondin*, 238 F.3d at 166 (stating that "if a child's testimony is germane to the question of whether a grave risk of harm exists upon repatriation, a court may take it into account"). The Court finds that Samuel is mature enough and old enough to take consideration of his views, particularly where, as here, the Court is taking his views into account as a factor, and not a conclusive determination of whether to deny repatriation. *Id.* ("[I]t stands to reason that the standard for considering a child's testimony *as one part of a broader analysis* under Article 13(b) would not be as strict as the standard for relying *solely* on a child's objection to deny repatriation under Article 13.") (emphasis in original).

The evidence presented at the hearing reveal that Sam is a very bright and intelligent individual. He is a gifted child, which means he is in a class that is on par with his academics. He reads newspapers each day to follow events in Israel. The Court is particularly impressed by his behavior in learning of the upcoming legal proceedings and his desire to express his views in a letter and have them considered by the Court. The Court witnessed Sam's maturity firsthand in discussions with him in chambers after the

hearing. In both the Court's private discussions with Sam and in the presence of counsel, the Court was impressed by the level of maturity exhibited by Sam. It was evident that he understood the purpose and significance of these proceedings. Of course, while it is not possible to completely eliminate the possibility of influence by one parent, the Court saw no evidence of such influence in either the events leading up to Sam writing the letter, the contents of the letter itself, or in discussions with Sam. Finally, the Court finds that Sam, at age 10, is sufficiently old enough to have his views considered. *Blondin,* 238 F.3d at 167 (eight-year-old girl old enough to consider her views on returning to France).

Thus, for all the foregoing reasons, the Court makes the alternative holding that defendant has established the grave risk defense by clear and convincing evidence.

Both parties are fully capable of being excellent parents for Sam and Jacob. Regardless of whether there are additional legal proceedings in this case, the Court strongly encourages the parties to work out an arrangement which allows both Robert and Julie to be parents who are very much involved in their children's lives.

## ORDER

Based upon the foregoing, the submissions of the parties, the arguments of counsel and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that plaintiff's petition for return of the child to plaintiff [Docket No. 1] is **DENIED.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: May 9, 2002
at Minneapolis, Minnesota.

John R. Tunheim
JOHN R. TUNHEIM
United States District Judge

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

> ***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.